IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 25, 2008

Charles R. Fulbruge III
Clerk

No. 06-20157

BRAD KIRSCHBAUM, on behalf of himself and all others similarly situated

Plaintiff - Appellant

RAYMOND ROYER

Appellant

v.

RELIANT ENERGY, INC., ET AL.,

Defendants

RELIANT ENERGY, INC.; T. MILTON HONEA; MILTON CARROLL;
JOHN T. CATER; RICHARD E. BALZHISER; JAMES A. BAKER, III;
BENEFITS COMMITTEE OF RELIANT ENERGY; DAVID M.
MCCLANAHAN; MARY P. RICCIARDELLO; GARY WHITLOCK; LEE
HOGAN; WATERS S. DAVIS IV; STEVE SHAEFFER; TOM STANDISH

Defendants - Appellees

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:02-CV-2051

Before JONES, Chief Judge, and STEWART and CLEMENT, Circuit Judges.

EDITH H. JONES, Chief Judge:

Brad Kirschbaum ("Kirschbaum"), an employee of Reliant Energy, Inc.
("REI") and a participant in the Reliant Energy Savings Plan ("Plan"), brought

this ERISA class action against REI and the REI Benefits Committee (collectively, "REI defendants") representing current and former plan participants on whose behalf the Plan purchased or held shares of the Reliant Energy Common Stock Fund from August 2, 1999 to May 16, 2002. The district court certified the class but granted the REI defendants' motion for summary judgment on all claims. We AFFIRM. Even if the REI defendants had a fiduciary duty to liquidate the Common Stock Fund and cease purchasing REI shares, notwithstanding the Plan's express contrary requirements, Kirschbaum falls short of bearing his heavy burden to rebut the presumption that the defendants satisfied their legal duties.

## BACKGROUND

The relevant version of the Plan was adopted on April 1, 1999. Pursuant to a Trust Agreement adopted simultaneously and incorporated into the Plan, all Plan assets were held in trust by the Northern Trust Company ("Trustee").[1] The Trustee, REI, and the Benefits Committee were all named in the Plan as fiduciaries for specific purposes. The Plan is an Eligible Individual Account Plan ("EIAP") under ERISA. 29 U.S.C. § 1107(d)(3). Consequently, participants could invest in a number of funds, ranging from riskier, growth-oriented funds to more stable mutual funds. One investment option under the plan was the REI Common Stock Fund ("Common Stock Fund"). With the exception of a small cash component for liquidity purposes, the Common Stock Fund was invested entirely in REI common stock.

Participants were permitted to invest up to sixteen percent of their compensation in the Plan. REI agreed to match up to the first six percent of an employee's contribution with shares of REI common stock allocated to the employee's Common Stock Fund account. Matching contributions were to

---

[1] The Northern Trust Company was not named as a party to this action.

remain in the Common Stock Fund for all employees who had not yet attained the age of fifty-five years with ten years of service with the company. After reaching that benchmark, employees could divest a portion of their holdings in the Common Stock Fund.[2] The participants' holdings of REI stock and the Common Stock Fund assets thus arose from two sources: employees' voluntary purchases of the Common Stock Fund as a Plan option, and REI's matching contributions in the form of REI common stock.

The value of the Common Stock Fund fell when the price per share of REI common stock dropped about forty percent, from $24.60 on May 9, 2002, to $14.50 a week later. The drop was occasioned by the disclosure that some REI employees had engaged in "round-trip" energy trades between 1999 and 2001. In these sham transactions, REI and another energy trader would "sell" identical quantities of power or natural gas to each other simultaneously, for the same price. Although no gas, power or money ever changed hands, the "round-trip" trades were booked as transactions to inflate REI's trading volume. The disclosure occurred in stages. On May 10, 2002, REI withdrew a planned $500 million debt offering in light of the possibility that "round-trip" trading had occurred. On May 13, REI publicly confirmed that such trades had inflated revenues by about ten percent over a three year period. On May 16, senior executives implicated in the "round-trip" trading resigned.

In his three-count Fourth Amended Complaint, Kirschbaum alleges that the REI defendants are responsible under ERISA to make good the losses the Plan sustained on REI common stock. Counts I and II both allege the REI defendants should have known, based on information available to them, that REI stock was not a prudent investment. Count I focuses on information

---

[2] This restriction was removed effective May 6, 2002 (shortly before the adverse disclosures that are the center of this lawsuit), and employees were allowed to direct their REI matching contributions to any fund in the Plan.

available to the public, while Count II focuses on non-public information (the "round-trip" trades). Both counts assert that because REI common stock became an imprudent investment, the REI defendants had a fiduciary duty to (a) halt all Plan purchases of REI common stock, (b) sell the Plan's holdings in REI common stock, and (c) terminate the Common Stock Fund. Count III alleges that the REI defendants breached their fiduciary duties by negligently misrepresenting REI's financial condition to Plan participants in documents that incorporated the company's SEC filings.

After certifying the class, the district court granted summary judgment to the REI defendants on all three Counts. On Counts I and II, the court reasoned that the REI defendants could be fiduciaries only to the extent they exercised discretionary control over the Plan. Since the Plan afforded them no discretion to terminate the fund or halt investments in it, the district court concluded the REI defendants had no fiduciary duty to do so. As to Count III, the district court held that the alleged misrepresentations were made by REI in its corporate capacity, not its fiduciary capacity, and were not actionable under ERISA. Kirschbaum has appealed.

## DISCUSSION

We review a grant of summary judgment de novo, using the same standards applied by the district court. Condrey v. SunTrust Bank of Georgia, 429 F.3d 556, 562 (5th Cir. 2005). Summary judgment is proper when the movant can demonstrate that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. Willis v. Coca Cola Enterprises, Inc., 445 F.3d 413, 416 (5th Cir. 2006). On review of a grant of summary judgment, all facts and inferences must be construed in the light most favorable to the non-movant. Murray v. Earle, 405 F.3d 278, 284 (5th Cir. 2005).

A brief sketch of the ERISA principles underlying the operation of the REI Savings Plan is in order. ERISA provides that an employer who sponsors an employee plan may also serve as a fiduciary of that plan. The statute imposes on the employer-fiduciary and on those who manage the plan strict statutory duties, including loyalty, prudence, and diversification. See 29 U.S.C. § 1104(a)(1). Under the common law of trusts, an employer could not invest plan assets in its own stock without creating an impermissible conflict of interest. See Pegram v. Herdrich, 530 U.S. 211, 225, 120 S. Ct. 2143, 2152 (2000). But Congress, for well-documented policy reasons, has encouraged plan ownership of employer stock and has exempted such investments from certain of ERISA's fiduciary requirements. See, e.g., Donovan v. Cunningham, 716 F.2d 1455, 1466-67 (5th Cir. 1983). In particular, for an EIAP like that before us, there is no "cap" on the percentage of permissible investments in the employer's own securities. Compare 29 U.S.C. § 1107(b)(1) with § 1107(a)(3)(A). Further, an EIAP fiduciary's decision to purchase or hold the employer's securities is exempt from the duty to diversify and the related duty of prudence insofar as it concerns asset diversification. 29 U.S.C. § 1104(a)(2). The fiduciary remains bound, however, by its other statutory fiduciary duties. See, e.g., Martin v. Feilen, 965 F.2d 660, 665, 670 (8th Cir. 1992). With these general principles in mind, we turn to the discussion of each count.

## Count I - Publicly Available Information

As it happens, the general statutory principles are sufficient to affirm the district court's grant of summary judgment on Count I. Kirschbaum here avers that the REI defendants should have concluded, based on publicly available information, that REI common stock was an imprudent investment. Count I alleges that the transformation of REI from a "traditional power utility company" into a "speculative energy trading operation" changed REI common

stock from a "classic long term conservative investment" to a "risky and volatile one." The company's change in business strategy, Kirschbaum contends, made it imprudent for the REI defendants to continue investing "such massive amounts or such a large percentage of [the Plan's] assets" in REI common stock.

By its terms, Count I asserts that the Plan became too heavily weighted in high-risk REI stock when the company dove into energy trading. Count I faults the REI defendants for failing to maintain an appropriate "portfolio mix," and for not evaluating the risk and reward of the Common Stock Fund in the context of all the Plan's investments. Kirschbaum does not claim in Count I that REI common stock was an imprudent investment per se, but rather that it was too risky for the Plan to hold in large quantities. Despite Kirschbaum's efforts on appeal to recast this as a claim of imprudence, Count I clearly states a failure to diversify. See Fourth Amended Complaint, ¶ 6 (faulting Defendants for, inter alia, "failing to diversify the assets of the Plan"); see also 29 U.S.C. § 1104(a)(1)(C) (imposing a duty of the diversification "so as to minimize the risk of large losses").

The REI defendants correctly observe that ERISA exempts an EIAP from the duty to diversify with regard to the purchase or holding of company stock. 29 U.S.C. § 1104(a)(2). The construction of this statutory exemption begins with the language of the statute. Hughes Aircraft Company v. Jacobson, 525 U.S. 432, 438, 119 S. Ct. 755, 760 (1999). "And where the statutory language provides a clear answer, it ends there as well." Id. The statute states that "the diversification requirement . . . and the prudence requirement (only to the extent that it requires diversification) . . . [are] not violated by acquisition or holding of qualifying employer real property or qualifying employer securities [in an EIAP]." § 1104(a)(2). Despite the risks inherent in concentrating plan assets in any one security, the express statutory exemption of the diversification duty in

6

relation to an employer's stock holdings precludes the recovery Kirschbaum seeks under Count I.

Count II-Non-public Information

Unlike Count I, Count II states a claim for more than failure to diversify. Count II alleges it was imprudent for the Plan to hold even one share of REI stock during the period when "round-trip" trading had artificially inflated its price. The diversification exemption stated in § 1104(a)(2) does not exempt EIAP fiduciaries from liability for "other forms of imprudence." See, e.g., In re McKesson HBOC, Inc. ERISA Lit., 391 F. Supp. 2d 812, 825 (N.D. Cal. 2005). Count II asserts that in light of this inflation, the REI defendants had a fiduciary duty to halt further purchases of REI common stock, sell the Plan's holdings in the Common Stock Fund, and terminate the Fund. Three significant issues are presented by these allegations. First, do the terms of the REI Plan mandate that company common stock be an available investment option for participants, and that it must be the exclusive vehicle for company matching contributions? Second, what, if any, fiduciary duties pertain to REI or the Benefits Committee with respect to investments in the REI Common Stock Fund? Third, if such duties exist, by what standard should a court review the alleged breaches of duties?

1. Plan Requirements Concerning REI Stock

The Plan documents, considered as a whole, compel that the Common Stock Fund be available as an investment option for employee-participants; require that REI common stock be the basis for the company's matching contributions; and authorize investment of contributions and dividends to the Fund solely in REI common stock. These mandatory provisions are embedded in the Plan and could not be terminated or modified absent a Plan amendment. Section 8.1 of the Plan presumes the existence of the Common Stock Fund and

requires the investment of all REI matching contributions into the Fund.[3] Likewise, Attachment A, fully incorporated into the Plan by Section 8.1, reflects that the Benefits Committee had no authority to delete the Common Stock Fund as an investment option. Further, the Trust Agreement, incorporated into the Plan by Section 9.1, states that the Plan's investment funds "<u>shall</u> consist of the Reliant Energy Common Stock Fund and other such Investment Funds selected and approved by the Committee from time to time." Trust Agreement, Section 4.1 (emphasis added). Altering any of these provisions would have required REI, acting in its capacity as a settlor, to amend the Plan.

It is clear that the Plan required the Fund to be invested almost exclusively in REI common stock, preserving only a minimal cash component to maintain liquidity for transactions in the stock. Attachment A specifies that the Common Stock Fund is to be "primarily invested and reinvested" in REI common stock. Kirschbaum asserts that this language would have permitted the REI defendants to increase the cash component of the Fund up to forty-nine percent of its total holdings. On the contrary, Section 4.2(a) of the Trust Agreement directs the Trustee to invest all contributions to the Fund in REI common stock "as soon as practicable." The remainder of that section, as well as Section 6.7, require the Trustee to invest the Common Stock Fund exclusively in REI stock, with an exception of a small, short-term cash component "as necessary to make any distribution or payment." The Statement of Investment Policy, albeit not a constitutive Plan document, reflects these detailed restrictions when it provides that no more than .25 percent to 1.25 percent of the Fund's total value may be held in cash. A cash percentage greater than that necessary for minimal liquidity would have contravened Plan requirements.

---

[3] With the limited exception of employees who had attained the age of fifty-five years and ten years of service with the company — those employees were permitted under the Plan to direct their matching contributions to other funds. See supra.

Based on all of these provisions, neither REI nor the Benefits Committee were given express discretion to halt the purchase of REI common stock or invest Fund assets in other holdings.

## 2. Who is a Fiduciary?

If Plan "fiduciaries" would violate the Plan by deviating from the mandatory retention and acquisition of REI stock in the Common Stock Fund, the district court reasoned, they had no discretion, and hence no fiduciary duty, to deviate. Kirschbaum, supported by the Department of Labor as an Amicus, strenuously disagrees that Plan managers can, by the expedient of applying mandatory Plan provisions, divest themselves of their prudential fiduciary duty not to purchase company stock that they know is artificially inflated. These circumstances raise subtle questions concerning the scope of fiduciary responsibility for employee savings plans that feature company stock as an investment option or a matching contribution.[4]

The Supreme Court has noted that the first question pertinent to establishing ERISA liability is whether the defendant is in fact a fiduciary. Pegram, 530 U.S. at 226, 120 S. Ct. at 2152-53. ERISA plan managers bear fiduciary responsibility correlative with the scope of their duties. An ERISA fiduciary for one purpose is not necessarily a fiduciary for other purposes. Bannistor v. Ullman, 287 F.3d 394, 401 (5th Cir. 2002); see also Cotton v. Mass. Mut. Life Company, 402 F.3d 1267, 1277 (11th Cir. 2005) (fiduciary status under ERISA is not an "all-or-nothing" concept). Rather, a person is a fiduciary only "to the extent" he has or exercises specified authority, discretion, or control over a plan or its assets:

> [A] person is a fiduciary with respect to a plan to the extent (i) he
> exercises any discretionary authority or discretionary control

---

[4] This court's decision in Langbecker v. Electronic Data Systems Corp. touched upon but did not resolve these questions. 476 F.3d 299, 308 n.19, 312 n.24 (5th Cir. 2007).

respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). Fiduciary duties may thus arise either from the terms of the governing plan or from acts and practices in carrying it out. Id.; see also Bannistor, 287 F.3d at 401. Excluded from fiduciary responsibilities, however, are the decisions of a plan sponsor to modify, amend or terminate the plan; such decisions are those of a trust settlor, not a fiduciary. Hughes Aircraft, 525 U.S. at 444, 119 S. Ct. at 763.

REI begins its defense with the contention that investments in the REI Common Stock Fund were "hard wired" into the Plan, and that it, as settlor, cannot be liable in damages for what would amount to a compelled amendment, termination, or modification of the Plan. In interpreting 29 U.S.C. § 1002(21)(A), the Supreme Court emphasized that employers or other plan sponsors "are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans." Lockheed Corporation v. Spink, 517 U.S. 882, 890, 116 S. Ct. 1783, 1789 (1996) (internal quotations omitted). This holding was extended to employee retirement plans in Hughes Aircraft. 525 U.S. at 444, 119 S. Ct. at 763. The Court emphasized that the term fiduciary with respect to a plan encompasses "management" and "administration" of the plan, but does not include plan design. Id. Thus, when employers undertake actions to adopt, modify or terminate a plan, "they do not act as fiduciaries but are analogous to the settlors of the trust." Spink, 517 U.S. at 890, 116 S. Ct. at 1789 (internal citations omitted). Viewed solely from this perspective, Kirschbaum's insistence that REI had an obligation to terminate the Common Stock Fund, cease purchasing REI stock for the Fund, and liquidate the Fund's investment in REI common stock seeks no less than systemic modifications of the Plan itself.

Because the Plan's design was allotted to REI, as settlor, the company had no fiduciary duty concerning such terms.

Kirschbaum, for his part, responds that the Court has distinguished between "the composition or design of the Plan itself" and "the employer's fiduciary duties which consist of such actions as the administration of the Plan's assets." See Hughes Aircraft, 525 U.S. at 444, 119 S. Ct. at 763. Moreover, REI was involved in the Plan administration and asset management because, pursuant to the Plan, it was both a named fiduciary and directed the Trustee and because it apparently played a part in promulgating a Statement of Investment Policy,[5] which detailed how the Plan's investments would be managed. We may easily reject the first two grounds for REI's alleged fiduciary status. The terms of the Plan, which named REI as fiduciary and enabled it to direct the Trustee, also specifically limited REI's authority.[6] REI could be a fiduciary "to the extent" of its carrying out the activities referenced in the Plan, but its fiduciary duty status cannot be expanded beyond them.

Interpreting the Statement of Investment Policy, however, poses a closer question. This is a document formally adopted by the Benefits Committee for the purpose of establishing the policy for management of Plan assets. In its preamble, the policy states:

> This Statement may be modified, in whole or in part, by Reliant Energy at any point in time. Reliant Energy may provide supplemental guidelines for each investment option of the Plan.

[5] The REI defendants submit that the Policy was promulgated by the Benefits Committee, but the Policy reads as a statement by REI itself, e.g., "This statement may be modified, in whole or in part, by Reliant Energy at any point in time." At the very least, there is a fact issue as to this question.

[6] Plan, §§ 1.26, 2.13.

11

The Statement goes on to declare that the Benefits Committee "has responsibility and authority for the operation of the Plan, including administration and investment of the Plan's assets." Further, "the Benefits Committee will serve as the 'named fiduciary' of the Plan under ERISA with respect to the management and investment of the Plan's assets." The Policy then briefly outlines the investment objectives of the Plan; the funding requirements; the target allocation of long-term assets; monitoring; and performance guidelines.

On one hand, the Statement expressly complies with the provision of the Plan making the REI Common Stock Fund a mandatory feature and compelling as close to one hundred percent of its assets as possible to be invested in REI stock. One could also read REI's above-quoted modification authority simply to reflect its position as the Plan's settlor. This Statement is not, however, a Plan document. That it reserves to REI the right to provide "supplemental guidelines for each investment option" might alternatively be construed as going beyond plan design and into discretionary asset management. Notwithstanding the arguably reserved power in the Statement, when REI eliminated the restrictions on age and tenure that limited employees' rights to sell company matching stock that had been allocated to their plans, it amended the Plan.[7] The mandatory plan provision took precedence, in practice, over the vague language of the Statement. In sum, there seems to be a factual issue whether REI had discretionary authority in the management of the Plan or exercised any authority respecting management or disposition of its assets. See 29 U.S.C. § 1002(21)(A)(i). Perhaps the reservation of such authority could give rise to fiduciary duties pertinent to the Common Stock Fund.

---

[7] See note 2, supra.

The Benefits Committee, by contrast, is explicitly made a fiduciary in its discretionary authority over Plan management and the exercise of actual asset-management activities. REI contends that the Benefits Committee had no fiduciary duties with respect to acquiring and holding REI stock beyond the duty to comply with the Plan's mandatory guidelines. REI further contends, not without reason, that if the decisions to cease acquiring REI common stock, terminate the fund, and liquidate the REI common stock holdings amount to settlor's decisions, then the Benefits Committee should not have fiduciary duties inconsistent with or broader than those of the settlor.

Because the Plan's requirements to invest in REI stock are mandatory and were treated as such by REI and the Benefits Committee, we agree with the district court that no fiduciary duties are inherent in the Plan other than to follow its terms. Whether the Statement of Investment Policy gave rise to implied authority by REI, and whether REI and the Benefits Committee were subject to broader fiduciary duties under the supervening compulsion of ERISA are close questions that we need not definitively resolve in this opinion.

3. <u>Fiduciary Duty to Override?</u>

Kirschbaum asserts that the REI defendants not only had the authority, but on these facts, a fiduciary duty to cease the Fund's continued investment in REI common stock. Bluntly, they had a fiduciary duty to disobey the plain terms of the Plan—and Congress's sanction for company stock purchase plans—in order to comply with ERISA's equal duties to invest prudently and not to violate the statute. See 29 U.S.C. §§ 1104(a)(1) and (a)(1)(D). See also Laborers National Pension Fund v. N. Trust Quantitative Advisors, Inc., 173 F.3d 313, 322 (5th Cir. 1999) ("A fiduciary may not discharge his duties in a manner inconsistent with ERISA provisions.").

Citing these provisions, is, however, far easier than propounding a test for their violation. One hypothetical frequently cited by both parties is a benefits

plan written to require investment in lottery tickets. Such an anomalous plan would violate ERISA, and a fiduciary would be bound to deviate from the plan's requirements.

But shares of REI's common stock are neither lottery tickets nor an investment that is intrinsically and in all cases imprudent. Kirschbaum contends that the stock became an imprudent investment when the defendants obtained adverse information about the "round-trip trading". Far from being clear-cut, this claim requires a balance to be struck among competing congressional purposes. See Varity Corp. v. Howe, 516 U.S. 489, 497, 116 S. Ct. 1065, 1070 (1996). Generally, Congress's intent in ERISA is to balance the protection of employee benefits against creating a system "so complex that administrative costs, or litigation expenses, unduly discourage employers from offering welfare benefit plans in the first place." Id. Moreover, in this particular context Congress has expressed a strong preference for plan investment in the employer's stock, although this preference may be in tension with ERISA's general fiduciary duties. See, e.g., Langbecker v. Elec. Data Sys. Corp, 476 F.3d 299, 309 n.19 (5th Cir. 2007).

The question is how to define when the duty of prudence might require a fiduciary to disobey the clear requirements of an EIAP and halt the purchase of employer stock. In this, as in all cases, the test of prudence is one of conduct, not results. Donovan, 716 F.2d at 1467. The prudence test asks whether the fiduciary selected investments "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). The focus of the inquiry is "how the fiduciary acted," not "whether his investments succeeded or failed." Donovan, 716 F.2d at 1467 (internal citation

omitted). The prudence requirement is a flexible standard, and a fiduciary's conduct must be evaluated "in light of the character and aims of the particular type of plan he serves." Id. (internal quotation omitted). Relevant here are the "long-term horizon of retirement investing," as well as the "favored status Congress has granted to employee stock investments in their own companies." Langbecker, 476 F.3d at 308; see also Varity, 516 U.S. at 497, 116 S. Ct. at 1070 (courts must interpret ERISA's fiduciary duties in a manner consistent with "the special nature and purpose of employee benefit plans." (internal citation omitted)).

Attempting to strike the proper balance, the Third Circuit adopted an abuse of discretion standard of review for a fiduciary of an Employee Stock Option Plan ("ESOP") that is designed to invest primarily in an employer's stock. Moench v. Robertson, 62 F.3d 553, 571 (3d Cir. 1995) (concerning ESOPs); Edgar v. Avaya, Inc., 503 F.3d 340, 347 (3d Cir. 2007) (extending Moench's reasoning to EIAPs). The Moench court was unwilling to subject these fiduciaries to the "strict scrutiny" that applies under conventional trust law to a trustee who is simply authorized, but not encouraged or required, to make a particular investment. Doing so, it noted, would eviscerate the statutory preference for ESOPs. Moench, 62 F.3d at 570. Rather, Moench concluded that a fiduciary of this sort of plan is entitled to a presumption that his decision to invest in the employer's securities was prudent. A plaintiff may rebut the presumption only by showing that "owing to circumstances not known to the settlor and not anticipated by him [the making of such investment] would defeat or substantially impair the accomplishment of the purposes of the trust." Id. at 571 (quoting RESTATEMENT (SECOND) OF TRUSTS, § 227 cmt. g). In Moench, there was a triable question on this point because the facts showed a "continual and precipitous" drop in stock price, the fiduciaries' knowledge of the company's

15

impending collapse, and their internal conflicts over the proper course of action for the ESOP.

Both parties initially disagreed that Moench should be the governing authority for this case. Kirschbaum contends that the court's presumption in favor of continued company stock investment should not apply at all where allegations, like his, relate to the fiduciaries' knowing purchases of stock at an artificially inflated price. Moench, Kirschbaum argues, concerned a "mere" failure to diversify. We reject this limitation. The distinction between these allegations is not only often elusive, but hardly justified by Moench itself. The opinion dwelt at length on the Benefits Committee's internal discussions based on their insider knowledge and fears about the company's dire financial prospects. More to the point, there is no principled difference between how a fiduciary should respond to "artificial inflation" of the stock price as opposed to other sorts of negative insider information. Consequently, the standard of judicial review applicable to such decisions should not generally turn on pleading artifices. The Moench presumption logically applies to any allegations of fiduciary duty breach for failure to divest an EIAP or ESOP of company stock.[8]

For their part, the REI defendants resist application of the Moench presumption insofar as it expressly applies only where a plan strongly favors but does not compel investment in company stock.[9] The REI Savings Plan, as noted, affords no discretion to enter into other investments. This is a potent objection,

---

[8] Moench, of course, would not apply to allegations like those in Count I, above, which fairly state only a violation of the fiduciaries' duty to diversify, because ERISA specifically exempts fiduciaries from that duty relating to a plan authorizing or requiring purchases of company stock.

[9] Unlike the REI Savings Plan, the plan in Moench was only "biased" toward employer stock. The court concluded the plan gave the fiduciaries some measure of discretion to invest in less-risky holdings as necessary. Moench, 62 F.3d at 567. Accordingly, the court limited its ruling to cases where a fiduciary "is not absolutely required to invest in employer securities but is more than simply permitted to make such investments." Id. at 571.

for Moench recognized that a greater degree of deference, and hence a lesser degree of judicial scrutiny, would be appropriate to such mandatory plans. Id. (citing RESTATEMENT (THIRD) OF TRUSTS § 228) (noting "the trustee must comply" in such a situation unless compliance would be impossible or illegal).[10] While Moench did not resolve the issue, the court clearly implies that a plan participant would bear an even heavier burden of showing a fiduciary duty breach where the plan utterly compelled investment in company stock.[11] Like Moench, however, we decline to speculate on the scope of a fiduciary duty to override clear and unequivocal plan terms. In this case, even if a factfinder concluded that the REI defendants are fiduciaries for this purpose and had some discretion to override the Plan, Kirschbaum's allegations fail to rebut the Moench presumption of prudence.

Moench concluded it might have been imprudent for the fiduciaries to continue investing in company stock that steadily lost ninety-eight percent of its value over two years, falling from $18.25 per share to $0.25 per share. It was also relevant that the fiduciaries were aware of the company's impending collapse, and the employer ultimately filed for Chapter 11 bankruptcy protection. Moench, 62 F.3d at 557. In contrast to the company-wide failure evidenced in Moench, here Kirschbaum has alleged round-trip trading by a few employees

---

[10] See also Edgar, 503 F.3d at 346 n.10 (noting that Moench "explicitly left open the issue of whether there could still be a breach of fiduciary duty" in a case where the plan absolutely required a particular investment). Edgar did not reach this question either. Id. at 347 n.11.

[11] In most comparable circuit court opinions, the benefits plan at issue left the fiduciary some discretion to take the action plaintiffs were seeking. See Edgar, 503 F.3d at 347 n.11; DiFelice v. U.S. Airways, Inc., 497 F.3d 410, 416-17 (4th Cir. 2007); Moench, 62 F.3d at 571. One exception is the Ninth Circuit's decision in Wright v. Oregon Metallurgical Corp., where the fiduciaries had no discretion to take the requested action. 360 F.3d 1090, 1097 (9th Cir. 2004) ("Selling the stock in either scenario would have been in violation of the Plan's express terms.") The Wright court did not find it necessary to proceed beyond Moench, concluding that even under the Moench standard plaintiff could not prevail. Id. at 1097-98.

and an initial drop in REI's stock value of approximately forty percent. There is no indication that REI's viability as a going concern was ever threatened, nor that REI's stock was in danger of becoming essentially worthless. This is a far cry from the downward spiral in Moench, and much less grave than facts other courts routinely conclude are insufficient to rebut the Moench presumption.[12] As the Ninth Circuit has explained, "[m]ere stock fluctuations, even those that trend downward significantly, are insufficient to establish the requisite imprudence to rebut the Moench presumption." Wright, 360 F.3d at 1099. If Kirschbaum cannot carry his burden under Moench, he cannot meet any higher standard appropriate where an EIAP absolutely requires investment in employer stock.

We do not hold that the Moench presumption applies only in the case of investments in stock of a company that is about to collapse. The presumption, however, is a substantial shield. As Moench states, it may only be rebutted if unforeseen circumstances would defeat or substantially impair the accomplishment of the trust's purposes. Moench, 62 F.3d at 571. One cannot say that whenever plan fiduciaries are aware of circumstances that may impair the value of company stock, they have a fiduciary duty to depart from ESOP or EIAP plan provisions. Instead, there ought to be persuasive and analytically rigorous facts demonstrating that reasonable fiduciaries would have considered themselves bound to divest. Less than rigorous application of the Moench presumption threatens its essential purpose. A fiduciary cannot be placed in the

---

[12] Wright, 360 F.3d at 1096, 1098 (ill-fated merger, reverse stock split, and seventy-five percent drop in stock price were insufficient to rebut Moench presumption of prudence); Kuper v. Iovenko, 66 F.3d 1447, 1451, 1459 (6th Cir. 1995) (company-wide financial woes and eighty percent drop in stock price insufficient); In re McKesson, 391 F. Supp. 2d at 830-33 (declining to apply Moench, but concluding widespread accounting violations, restated revenues for three years, and seventy-five percent drop in stock price were insufficient to rebut presumption in any event).

untenable position of having to predict the future of the company stock's performance. In such a case, he could be sued for not selling if he adhered to the plan, but also sued for deviating from the plan if the stock rebounded.[13]

A further objection to tempering the Moench presumption is that, in some cases, requiring a fiduciary to override the terms of a company stock purchase plan could suggest the necessity of trading on insider information. Such a course is prohibited by the securities laws. Fiduciaries may not trade for the benefit of plan participants based on material information to which the general shareholding public has been denied access. Moreover, from a practical standpoint, compelling fiduciaries to sell off a plan's holdings of company stock may bring about precisely the result plaintiffs seek to avoid: a drop in the stock price. These objections, as well as the lack of clear textual support in ERISA for creating a presumption, have led some courts to reject even the limited possibility of liability provided for by Moench.[14] We do not do so. Instead, we find in these objections a reenforcement of the conclusion that the Moench presumption cannot be lightly overcome.

Because Kirschbaum failed to rebut the Moench presumption, summary judgment on Count II of the Complaint was proper.

Negligent Misrepresentation

In Count III of the Complaint, Kirschbaum brings an ERISA claim for alleged misrepresentations that the company made concerning its financial

---

[13] As the Third Circuit has noted, courts must be aware of the risks that "if the fiduciary, in what it regards as an exercise of caution, does not maintain the investment in the employer's securities, it may face liability for that caution, particularly if the employer's securities thrive." Moench, 62 F.3d at 572; See also In re Coca Cola Enterprises Inc. ERISA Lit, 1:06-CV-0953, 2007 WL 1810211, at *10 (N.D. Ga. June 20, 2007) (reasoning that a fiduciary who scraps plan requirements is "just as apt to be sued" as if he had enforced them).

[14] In re McKesson, 391 F. Supp. 2d at 830-33; In re Coca Cola Enterprises Inc. ERISA Lit, 2007 WL 180211, at *20.

condition. To recover for these statements under ERISA, as opposed to the securities laws, Kirschbaum must demonstrate that the representations were made in a fiduciary capacity. "ERISA liability arises only from actions taken or duties breached in performance of ERISA obligations." In re Worldcom, Inc., 263 F. Supp. 2d 745, 760 (S.D.N.Y. 2003). The relevant question is not whether an employer's action adversely affected a beneficiary's interest, but whether the employer was acting as a fiduciary when it took that action. Pegram, 530 U.S. at 226, 120 S. Ct. at 2152-53; Varity, 516 U.S. at 505, 116 S. Ct. at 1074.

Here, Kirschbaum has failed to identify any misrepresentations made by the REI defendants in a fiduciary capacity. Kirschbaum claims the company misrepresented its financial condition in its Form 10-Q and 10-K filings with the SEC. He admits that the filings were made in REI's corporate capacity and do not constitute fiduciary communications, but, he argues, they became fiduciary communications when the REI defendants incorporated them into other documents, namely: (1) the Form S-8 Registration Statement for REI common stock filed May 28, 1999, and (2) the 10a Prospectus for REI common stock dated October 25, 2000, which was later distributed to Plan participants.[15]

In neither case has Kirschbaum shown the REI defendants were acting in anything other than a corporate capacity in making these statements or incorporating them into other documents. Varity, 516 U.S. at 505, 116 S. Ct. at 1074. REI's obligation to file a Form S-8 incorporating its SEC filings is a corporate obligation arising under the securities laws. 15 U.S.C. § 77e; 17 C.F.R. § 239.16b. The same is true of its obligation to incorporate its SEC filings into a 10a Prospectus, and to distribute that Prospectus to Plan participants. 17 C.F.R. § 230.428(a)(1), (b)(1). When it incorporated its SEC filings into the

---

[15] Kirschbaum's argument that the REI defendants used these documents to satisfy their obligations under § 404(c) of ERISA was not presented to the district court and is waived. See Little v. Liquid Air Corp., 37 F.3d 1069, 1071 n.1 (5th Cir. 1994).

Forms S-8 and 10a Prospectus, REI was discharging its corporate duties under the securities laws, and was not acting as an ERISA fiduciary. "Those who prepare and sign SEC filings do not become ERISA fiduciaries through those acts, and consequently, do not violate ERISA if the filings contain misrepresentations." WorldCom, 263 F. Supp. 2d at 766.

This case is easily distinguishable from Dynegy, a case relied on by Kirschbaum. In Dynegy the plaintiff alleged the employer had used the 10a Prospectus as the Summary Plan Description ("SPD") for ERISA purposes. In re Dynegy, Inc. ERISA Lit., 309 F. Supp. 2d 861, 869 (S.D. Tex. 2004) (ruling on 12(b)(6) motion). Kirschbaum makes no such claim, and the record reveals that the REI defendants issued a separate document to serve as the SPD. Kirschbaum has made no showing that the REI defendants were speaking as fiduciaries when they made the statements at issue. Accordingly, any remedy for these statements lies under the securities laws, not ERISA.

## CONCLUSION

For these reasons the judgment of the district court is AFFIRMED.